# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 03-3176/3272

———————

Timothy J. Knutson,      *

    *

      Cross-Appellant/Appellee,      *

    *      Appeals from the United States

v.      *      District Court for the Northern

    *      District of Iowa.

Ag Processing, Inc.,      *

    *

      Appellant/Cross-Appellee.      *

———————

Submitted: April 12, 2004
Filed: January 12, 2005

———————

Before MORRIS SHEPPARD ARNOLD, RILEY, and COLLOTON, Circuit
Judges.

———————

COLLOTON, Circuit Judge.

Ag Processing, Inc., appeals from a judgment of the district court entered after a jury verdict in favor of Timothy J. Knutson on his action brought under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. Knutson cross-appeals the district court's denial of his request for front pay. We reverse with directions to enter judgment in favor of Ag Processing.

I.

Knutson began working at Ag Processing's Eagle Grove bean processing plant in 1988. He performed a variety of jobs, eventually becoming a boiler operator. As a boiler operator, Knutson's primary responsibility was to ensure that the boilers had enough pressure to turn the turbines that created the electricity Ag Processing used to process soybeans. His job responsibilities included monitoring the control board in the boiler control room, making adjustments to the generator, watching the fires in the boiler, and adjusting the fire in the boiler. As a boiler operator, he also monitored gauges and operated buttons and valves on a daily basis.

Knutson testified about the additional tasks of "rodding the stokers" and pulling bottom ash from the boiler. Rodding a stoker (*i.e.*, a machine for feeding a fire) involved standing on a stool and using a rod to remove obstructions in the stoker by an up and down overhead motion, punching coal through to the fire. According to Knutson, the task of rodding the stokers occurs usually "once a shift, but there are days it happens twice a day, days it happens continually."

In 1998, Knutson underwent shoulder surgery. He returned to work with medical restrictions, and, for a period of time, Ag Processing allowed Knutson to call on a turbine operator for assistance. Knutson testified that the turbine operator "mostly just pulled my bottom ash and would be available by radio to help [with] other activities." Eventually, Knutson was back on full duty without restrictions, but needed assistance again after a hernia injury began to flare up.

On October 6 or 7, 1999, due to a combination of malfunctions and poor quality coal, the boilers were not creating enough energy to power the plant. To alleviate this problem, Knutson was required to expend extra effort rodding the stokers. Knutson noted the coal problems in the operator's log, saying, among other things, "Cleaned out CRAP. Called Ken Mohr to see if he had an extra man to help

rod - They didn't have anyone to send. Jim - This is way over the amount of heavy rodding I should be doing." The problems continued the next day, prompting the boiler operator on duty for that shift to write "Rodded both boilers all day! What a bitch! Shoulders starting . . . [to] hurt. We'll Be on light duty Also sharing Tim's pain killers . . . ."

Jim Brown, the Energy Center Superintendent, became angry when he read Knutson's comments in the operator's log. Concerned about Brown's reaction, Knutson approached the Plant Manager, Carl Parker, who asked Knutson to see a doctor to obtain current medical restrictions. Knutson received a "work status report" from a physician's assistant, stating that Knutson's lifting should be limited to twenty pounds, overhead lifting should be restricted to once per hour, and there should be no repetitive use of Knutson's left arm. Parker requested that Knutson obtain another opinion from a licensed physician. In the meantime, he removed Knutson from his job as boiler operator and told him to report to Brown for other assignments.

Shortly after Knutson's reassignment, Brown angrily told Knutson that he should not touch anything that would affect the process of the plant, and "not even push a button." (J.A. at 186-87). Knutson was given duties hosing down dirty floors, pushing a broom to clean the plant, and painting pipes and other areas of the plant. He also was assigned to perform water tests in the spring of 2000. The new work was within Knutson's medical restrictions, and his pay was not reduced. Knutson testified that "[t]he work didn't bother me. Just the concept of why I was doing it. . . . I was kind of degraded."

Knutson eventually obtained medical restrictions from a physician that were essentially the same as those applicable before the October 1999 incident. In November 1999, Ag Processing learned that Knutson had surreptitiously videotaped inside the plant without permission. Knutson then took a leave of absence for back surgery from December 1999 to March 2000. On March 14, 2000, shortly after he

returned to work, Ag Processing terminated Knutson, for the stated reason that he violated plant rules by videotaping inside the plant in November 1999. After he was terminated by Ag Processing, Knutson worked in a variety of jobs, including delivering motorhomes, selling copy machines, and providing security.

Knutson filed a complaint seeking damages arising out of his termination. In pre-trial litigation, Knutson did not argue that he was limited in the major life activities of lifting or working, and eventually abandoned his claim that he was actually disabled as a result of impaired ability to have sexual relations with his wife. Knutson did argue that he was terminated because Ag Processing mistakenly *regarded him* as disabled, in violation of the ADA and Iowa Civil Rights Act. Ag Processing did not brief this issue for consideration with its motion for summary judgment, so the claim was tried to a jury. The jury found Ag Processing liable and awarded Knutson back pay and punitive damages.

Ag Processing sought judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, arguing, among other things, that Knutson failed to establish the essential elements of his "regarded as" disability claim, and that there was insufficient evidence to submit the issue of punitive damages to the jury. The district court denied Ag Processing's motion. Subsequently, the district court ordered injunctive relief and reinstatement. Ag Processing appealed these rulings; Knutson cross-appealed, seeking an award of front pay.

II.

We review the denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the prevailing party, and we uphold a jury verdict unless we conclude that a reasonable jury could not have found for that party. *Top of Iowa Co-op. v. Schewe*, 324 F.3d 627, 634 (8th Cir. 2003). Although we must view the evidence in the light most favorable to the nonmoving

party, Knutson is not entitled to "the benefit of unreasonable inferences, or those at war with the undisputed facts." *Boudreau v. Wal-Mart Stores, Inc.*, 249 F.3d 715, 718 (8th Cir. 2001) (internal quotation and citation omitted).

To succeed under the ADA,[1] Knutson must first show that he is "disabled" within the meaning of the statute. Under the ADA, the term "disability" includes, among other things, "being regarded as having," 42 U.S.C. § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities" of the claimant. 42 U.S.C. § 12102(2)(A); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). The "regarded as" portion of the ADA was "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995) (internal quotation and citation omitted).

Knutson contends that Ag Processing regarded him as having an impairment that substantially limited him in the major life activity of "working." The Supreme Court has noted that "there may be some conceptual difficulty in defining 'major life activities' to include work, for it seems to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap." *Sutton*, 527 U.S. at 492 (internal quotation and citation omitted); *see also Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002). Ag Processing has not contested, however, that "working" is a "major life activity" under the ADA, so we continue to assume the point without deciding this "difficult question." *Williams*, 534 U.S. at 200; *see Orr*

_____

[1]Like the parties and the district court, we assume, for the purpose of resolving Knutson's claim, that the Iowa Civil Rights Act's "parallel" cause of action is substantially the same as his ADA cause of action. *See Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998).

*v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 724 n.3 (8th Cir. 2002), *cert. denied*, 124 S. Ct. 2396 (2004).

When the major life activity at issue is working, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491; *see also Murphy v. United Parcel Serv.*, 527 U.S. 516, 523-24 (1999). We have been mindful of the danger that "an inability to perform a specific job always can be recast as an inability to perform a 'class' of tasks associated with that specific job." *Williams,* 534 U.S. at 201. Our court thus has emphasized that a person's inability to perform "one particular job" is not a substantial limitation on the major life activity of working, *see Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 679 (8th Cir. 2001), and that "working does not mean working at a particular job of the person's choice." *Miller v. City of Springfield*, 146 F.3d 612, 615 (8th Cir. 1998). Because the inquiry on a motion pursuant to Rule 50 is the same as the inquiry on a motion for summary judgment pursuant to Rule 56, *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1025 (8th Cir. 2000), we have a substantial body of precedent that informs our inquiry whether Knutson produced sufficient evidence to support a finding that Ag Processing regarded him as substantially limited in the activity of "working." A brief survey of those decisions is helpful to place Knutson's claim in perspective.

In *Miller*, the plaintiff sought to become a city police officer. 146 F.3d at 614. She failed an agility test multiple times before eventually passing it, but then was rejected based on the results of a psychological test. In the interim, Miller applied for and accepted a position as a telecommunicator for the city emergency communications department. We affirmed the district court's grant of judgment as a matter of law in favor of the city, saying that the city "could not have regarded Miller as substantially limited in the major life activity of working because she was working for the city at the time." *Id.* at 615.

Similarly, in *Cooper v. Olin Corp.*, *Winchester Div.*, 246 F.3d 1083 (8th Cir. 2001), we confronted a claim of discrimination based on perceived disability after Cooper took leaves of absence for personal problems and depression. Her health care providers cleared her to return to her job as locomotive engineer, but the company's medical director would not allow her to operate the locomotive. In the meantime, Cooper worked for the company "answering phones in the office and working in the scale house as necessary." Although she received the same pay and benefits, she found the work "humiliating" and "useless" and sought to return to the locomotive engineer position. *Id*. at 1086-87. We held that the medical director's "conclusion that Cooper was precluded from her particular locomotive job is not sufficient to indicate that he considered her to be disabled in the activity of working." *Id*. at 1090.

In *Conant v. City of Hibbing*, 271 F.3d 782 (8th Cir. 2001), the City offered Conant a position as General Laborer, but then rescinded the offer after learning that Conant should not lift more than thirty pounds and should not repeatedly squat or bend. *Id*. at 784-86. We affirmed a grant of summary judgment, because the record did not include evidence showing that the City perceived Conant as "anything more than unable to perform this particular job." *Id.* at 785. Although there was evidence that the City had considered restructuring the specific job for which Conant applied, and then decided not to do so, we held that "no reasonable jury could find that the City regarded Conant as precluded from working a whole range or class of jobs." *Id.* at 786. Again in *Schuler v. SuperValu, Inc.*, 336 F.3d 702 (8th Cir. 2003), we affirmed a grant of summary judgment in favor of the defendant, this time where the evidence showed that SuperValu perceived Schuler as unable to perform the "functions necessary to a specific job in its warehouse," but not as "unable to perform other manual labor positions or even other warehouse positions." *Id*. at 705. *See also Epps v. City of Pine Lawn*, 353 F.3d 588, 593 (8th Cir. 2003) (affirming a grant of summary judgment where the evidence showed only that the City regarded Epps as unable to "perform as a policeman for Pine Lawn based on the particular demands of a Pine Lawn patrolman," and not that the City believed Epps "could not perform a

broad range of work"); *Brunko v. Mercy Hospital*, 260 F.3d 939, 942 (8th Cir. 2001) (affirming summary judgment where medical center had in place a seventy-five pound lifting requirement for staff nurses, and plaintiff's back condition limited her to lifting no more than forty pounds, because "Mercy did not perceive Brunko's lifting restriction as substantially limiting the major life activity of working as Mercy encouraged Brunko to apply for and accept other positions in the hospital."); *Shipley v. City of Univ. City*, 195 F.3d 1020, 1022-23 (8th Cir. 1999) (affirming summary judgment where the record showed that "Shipley was able to perform a variety of jobs," including car wash attendant, salesman, dry cleaner, and dish washer repairman, and because the City "regarded him only as unable to perform the job of firefighter"); *Smith v. City of Des Moines*, 99 F.3d 1466, 1474 (8th Cir. 1996) (rejecting an ADA claim where the City only "regarded Smith as unable to perform the duties of a firefighter").

The issue on this appeal, in light of these precedents, is whether the evidence supported a finding that although Knutson was not *actually* unable to work in a broad class of jobs, Ag Processing *regarded* Knutson as unable to work in a broad class of jobs. In considering this issue, we note some confusion in the briefs and record over the date of the alleged discrimination. The complaint alleged that Knutson was the victim of discrimination when he was terminated in March 2000, and the jury was instructed to determine whether Knutson was unlawfully discharged based on a perceived disability. In his brief, however, Knutson argues that the discrimination occurred not when he was terminated, but when he was reassigned from his position as boiler operator to other duties in mid-October 1999: "The discriminatory action took place when [Knutson] obtained restrictions from his doctor which did not preclude him from the boiler operator's position, and A[g Processing] assigned him to makeshift odd jobs, anyway, and told [Knutson] not to even touch a button. This took place in mid-October 1999." (Knutson Br. at 30). As we understand Knutson's position, therefore, he asserts that Ag Processing developed a perception of his disability in mid-October 1999, which resulted first in his reassignment and then in

his termination, but that the relevant perception was constant during the period from October 1999 through March 2000.

Knutson's principal argument is that "the assignment to makeshift odd jobs" shows that Ag Processing regarded him as being disabled. Knutson contends that Ag Processing's determination that he "could not do the job" of boiler operator constitutes "substantial evidence" from which a reasonable jury could determine that Ag Processing "regarded [him] as being disabled." (Knutson Br. at 22-23).

We do not believe Knutson's position can be squared with our cases. A reasonable jury could not have concluded, based on the evidence presented in this case, that Ag Processing regarded Knutson as unable to perform a broad class of jobs when it removed him from the position of boiler operator and assigned him to other work in the plant. Knutson himself claims that Ag Processing viewed him as capable of performing the functions inside the boiler control room (as contrasted with rodding the stokers and pulling ash), noting that Brown, the Energy Center Superintendent, was "of the opinion that [Knutson] was perfectly capable of operating the control room in October of 1999." (Knutson Br. at 11; J.A. 278; *see also* Knutson Br. at 4 ("Timothy was capable of pushing any button in the control room according to the plant manager. (App. 309).")). That Ag Processing assigned Knutson to different job duties at identical pay undermines Knutson's claim that the company regarded him as substantially limited in the major life activity of working. *See Cooper*, 246 F.3d at 1089; *Miller*, 146 F.3d at 615. While Knutson's new duties of hosing, brooming, and painting were different from those to which he was accustomed, we reiterate that "[w]orking does not mean working at a particular job of [one's] choice." *Id.*

In an effort to distinguish our substantial body of precedent finding insufficient evidence of perceived disability, Knutson argues that Brown's angry comment at the time of Knutson's reassignment showed that Ag Processing regarded Knutson as disabled from performing a broad class of jobs. Brown's comment instructing

Knutson not to "push a button," however, cannot bear the weight attributed to it by Knutson. It is undisputed that Knutson was reassigned to jobs involving considerable physical activity. Knutson admits that Ag Processing – and Brown in particular – regarded him as capable of performing the control room functions of the boiler operator position, which involved monitoring gauges, turning valves, and pushing buttons. In light of those undisputed facts, Brown's comment cannot reasonably be taken as an admission that Ag Processing regarded Knutson as physically unable to push a button.

Knutson relies on *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481 (8th Cir. 2002), and *Webner v. Titan Distribution, Inc.*, 267 F.3d 828 (8th Cir. 2001), in support of the jury verdict. In *Duty*, we held that the evidence was sufficient to support a finding of "disability" where medical evidence demonstrated that an employee suffered from "a permanent disability beyond a lifting restriction," and a vocational consultant testified that the employee's condition disqualified him from 6,780 jobs in the geographic area. *Id.* at 488, 491-92. In *Webner*, we upheld a finding of "disability" where a plaintiff's back injury substantially limited his ability to engage in heavy lifting, "to work, to twist, to bend, and to stand," and where a vocational expert testified that the injury precluded the plaintiff from performing work that fell in "the heavy and very heavy industrial classifications." *Id.* at 834-35.

We are not persuaded that these authorities control Knutson's case. Both *Duty* and *Webner* involved claims of "actual" disability, as opposed to the "regarded as" disability claim asserted by Knutson. *Duty*, 293 F.3d at 491; *Webner*, 267 F.3d at 834. The plaintiffs in *Duty* and *Webner*, moreover, presented vocational expert testimony to substantiate their claims that their physical restrictions disqualified them from classes of jobs or broad ranges of jobs. *Duty*, 293 F.3d at 488; *Webner*, 267 F.3d at 834. In contrast, Knutson failed to present evidence demonstrating that an inability to perform the tasks of rodding stokers and pulling ash represented a significant restriction on his ability to perform either a class of jobs or a broad range

of jobs in various classes, or that Ag Processing perceived him as so restricted. *See* 29 C.F.R. § 1630.2(j)(3)(i).

The jury's finding that rodding the stokers and pulling ash was an "essential function" of the boiler operator position is not sufficient to bolster Knutson's claim. The jury rejected Ag Processing's contention that a boiler operator must be able to perform these functions, and apparently accepted Knutson's view that Ag Processing could accommodate Knutson's limitations by arranging for a second employee to assist him. But even if Ag Processing was not justified in acting upon its view that rodding the stokers and pulling ash were essential functions of the boiler operator position, Knutson still must prove that the company regarded him as unable to perform a broad class of jobs. That Ag Processing may have removed him from the boiler operator job based on a misperception about whether his medical restrictions allowed him to perform *that particular job* does not establish that Knutson was perceived as "substantially limited" in the life activity of "working," and thus "disabled" within the meaning of the ADA. *See Cooper,* 246 F.3d at 1088 (finding insufficient evidence to prove disability where employee was reassigned despite clearance from her physicians to return to work without restriction). An employer is "free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job." *Sutton*, 527 U.S. at 490-91 (emphasis in original).

Ag Processing removed Knutson from his boiler operator position after he complained that it was painful for him to perform one responsibility associated with that particular job. Under the governing precedents, we find that there was insufficient evidence that the company regarded Knutson as unable to perform a class of jobs or a broad range of jobs, and we therefore conclude that the verdict cannot stand.

\*            \*            \*

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded with directions to enter judgment in favor of Ag Processing and to dismiss the complaint.

_____